IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2015 JAN -5 PM 3: 14

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

ISIS BRANTLEY and ISIS ORNAMENTATIONS
AND NATURAL HAIR CARE CONSULTANT
d/b/a The Institute of Ancestral Braiding,
Plaintiffs,

-vs-

Case No.  A-13-CA-872-SS

WILLIAM H. KUNTZ, JR. in his official capacity
as Executive Director of the Texas Department of
Licensing and Regulation; MIKE ARISMENDEZ
in his official capacity as Chair of the Texas
Department of Licensing and Regulation; LUANN
ROBERTS MORGAN in her official capacity as
Vice-Chair of the Texas Department of Licensing
and Regulation; and FRED N. MOSES,
CATHERINE RODEWALD, DEBORAH
YURCO, RAVI SHAH, and THOMAS F.
BUTLER in their official capacities as members of
the Texas Department of Licensing and
Regulation,
Defendants.

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Defendants William H. Kuntz, Jr., Mike Arismendez, LuAnn Roberts Morgan, Fred N.

Moses, Catherine Rodewald, Deborah Yurco, Ravi Shah, and Thomas F. Butler's Motion for

Summary Judgment [#33], Plaintiffs' Response [#36] thereto, Defendants' Reply [#39] thereto,

Plaintiffs Isis Brantley and Isis Ornamentations and Natural Hair Care Consultant d/b/a The Institute

of Ancestral Braiding's Motion for Summary Judgment [#34], Defendant's Response [#35] thereto,

and Plaintiffs' Reply [#40] thereto.  Having considered the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

**Background**

This 42 U.S.C. § 1983 action raises a constitutional challenge to the manner in which Texas regulates the practice of African hair braiding, a method of styling "tightly textured" or "coily" hair popular with men and women of African descent.  African hair braiding does not involve cutting hair, washing or conditioning hair, or treating hair with heat or chemicals; rather, it consists of "the intricate twisting, braiding, weaving, and locking of hair using a braider's hands[.]"  First Am. Compl. [#25] ¶ 13.  Plaintiffs allege the Texas statutory scheme governing licensure of schools which wish to teach African hair braiding is unconstitutional as applied and violative of the Due Process Clause of the Fourteenth Amendment.

**A.      Plaintiff Isis Brantley's Braiding Activities**

Plaintiff Isis Brantley is an African hair braider who has, for the past thirty-two years, made her living braiding African hair.  Brantley holds a Texas hair braiding license, may legally braid hair for compensation, and provides hair braiding services to the public through her sole proprietorship, Plaintiff Isis Ornamentations and Natural Hair Care Consultant d/b/a The Institute of Ancestral Braiding (the Institute),[1] an 800-square-foot space located inside a Dallas community center.  For

---

[1] Defendants argue the Institute has no standing.  But Defendants concede Brantley does, and the Court therefore "need not consider whether the remaining plaintiffs have standing to maintain the suit." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) (citing *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 192 (5th Cir. 2012)).  The Court notes, however, that under Texas law, the Institute, as a sole proprietorship, has no legal existence apart from Brantley herself; "Isis Ornamentations and Hair Care Consultant" is not an independent business organization (the moniker appears to refer to Brantley). *See, e.g., W. Alliance Ins. Co. v. N. Ins. Co. of N.Y.*, 176 F.3d 825, 833 & n.2 (5th Cir. 1999) (characterizing distinctions between a sole proprietor and his sole proprietorship as "legally irrelevant"); *CU Lloyd's of Texas v. Hatfield*, 126 S.W.3d 679, 686 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ("[T]he law treats the owner and the [sole proprietorship] as one and the same person."); *see also* First. Am. Compl. [#25] ¶ 8 (the Institute "is owned and operated by Plaintiff Brantley as a sole proprietorship").  Thus, the Institute's *capacity* to sue, separate and apart from Brantley, is unclear.

the last twenty years, Brantley, through the Institute, has offered instruction in African hair braiding to students who wish to learn to braid for a living. Because the Institute does not meet Texas's requirements to become a licensed "barber school," however, Brantley's students cannot satisfy the course work requirement necessary for their individual licensure by taking Brantley's hair braiding classes.

## B.    Texas's Regulatory Scheme

African hair braiding is regulated by Texas statutes governing the practice of "barbering." *See* TEX. OCC. CODE § 1601.002(1)(K). The statutory definition of "barbering" includes several trades, including cutting and washing hair, skin care, and nail care. *See id.* § 1601.002. Brantley's African hair braiding services fall within the portion of the definition that includes "braiding a person's hair, trimming hair extensions only as applicable to the braiding process, and attaching commercial hair only by braiding and without the use of chemicals or adhesives." *Id.* § 1601.002(1)(K).

Texas requires persons who perform any type of "barbering" to be licensed as required for the type of barbering performed. *See id.* § 1601.251. Braiders are required to obtain the "Hair

---

Capacity to sue is determined by the law of the forum state, *see* FED. R. CIV. P. 17(b)(3), and as already noted, there is no legal distinction between the sole proprietor and the sole proprietorship under Texas law. That legal unity led the Court of Federal Claims to hold a Texas sole proprietorship could not maintain suit independently from its sole proprietor. *See Nova Express v. United States*, 80 Fed. Cl. 236, 238–39 (Fed. Cl. 2008). Some states, however, note there is no legal distinction between the two, but nevertheless permit a sole proprietorship to sue even though the sole proprietor is the real party in interest. *See Adams Wrecker Serv. v. City of Blanchard*, 2013 WL 5726022, *1 n.2 (W.D. Okla. Oct. 221, 2013) (slip op.) (applying Oklahoma law). The Court has found no Texas cases confronting the question, and the parties did not address or brief the issue. Accordingly, the Court assumes, without deciding, that the Institute may maintain this suit separately from Brantley herself, and takes this approach in no small part because Brantley is also a named plaintiff. *Cf. Nova Express*, 80 Fed. Cl. at 239 ("[T]his case properly should have been brought on behalf of Mr. Emiabata doing business as 'Nova Express,' and not directly on behalf of Nova Express.").

Braiding Specialty Certificate of Registration," Texas's hair braiding license.[2]  *See id.* § 1601.259(a)

(stating persons holding the license may perform "only barbering as defined by § 1601.002(1)(K)").[3]

Unlike applicants for a general barbering license, who must complete a 1,500-hour curriculum and

pass both a written and practical examination, *id.* § 1601.253(a)(2); 16 TEX. ADMIN. CODE

§ 82.120(d), applicants for a hair braiding license need complete only a thirty-five hour curriculum

and are not required to pass an examination.  16 TEX. ADMIN. CODE §§ 82.20(b), (h); *id.* § 82.120(k).

Hair braiding techniques are not part of the 1,500-hour general barbering licensure curriculum.  *See*

16 TEX. ADMIN. CODE § 81.120(d).

     Only licensed barber schools may teach the practice of barbering as defined by the barbering

statutes; thus, only classes taught in licensed barber schools count toward the thirty-five hour hair

braiding curriculum requirement.  *See* TEX. OCC. CODE § 1601.001(a)(1-a).  A would-be barber

school must comply with a number of facility and equipment requirements in order to become

licensed.  *See id.* § 1601.353; 16 TEX. ADMIN. CODE § 82.23.  Those facility and equipment

requirements include the three Plaintiffs have placed in issue: (1) a requirement the school have "at

least 10 student workstations that include a chair that reclines, a back bar, and a wall mirror" (the

10-Chair Minimum); (2) a requirement the school install "a sink behind every two workstations" (the

5-Sink Minimum); and (3) a requirement the school have at least 2,000 square feet of floor space

---

[2] The statutory scheme distinguishes between certificates, licenses, and permits.  *See id.* § 1601.251.  In this Order, the Court refers to all relevant certifications as licenses.

[3] The regulations applicable to cosmetologists, rather than barbers, also allow persons to apply for a hair braiding license.  *See* 16 TEX. ADMIN. CODE § 83.20(e).  Obtainment of the license under the cosmetology regulations requires completion of the same thirty-five hour curriculum.  *Compare id.* § 83.120(b) (cosmetology regulations), *with id.* § 82.120(k) (barbering regulations).  The regulations applicable to licensure of cosmetology schools are not at issue in this case.

(the Square-Footage Minimum). TEX. OCC. CODE §§ 1601.353(1)(A),[4] (2)(A)–(B); 16 TEX. ADMIN. CODE §§ 82.23(d)(2)–(4); *see also* TEX. OCC. CODE § 1601.352(3) (requiring compliance with § 1601.353); 16 TEX. ADMIN. CODE § 82.23(a)(3) (same) (collectively, the Minimums). Plaintiffs aver compliance with the Minimums will cost approximately $25,000 on top of the expense of relocating from the space the Institute has occupied for twenty years and the higher monthly costs associated with renting a space over twice the Institute's current size.

Plaintiffs initiated this action by filing their original Complaint [#1] on October 1, 2013. Plaintiffs challenge the constitutionality of the Minimums as applied to them, arguing the Minimums bear no rational relationship to any legitimate government interest. Defendants are members of the Texas Department of Licensing and Regulation (TDLR), the agency charged with administration of the regulatory scheme, and the Texas Commission of Licensing and Regulation, which governs TDLR and appoints its administrative director. TEX. OCC. CODE §§ 51.101, 51.201, 1603.002. All are sued in their official capacities. While Plaintiffs originally asserted claims against Defendants under the Equal Protection Clause, Privileges and Immunities Clause, and Due Process Clause, the Court dismissed all but the substantive due process claim in its December 16, 2013 Order [#10]. Plaintiffs thereafter filed their First Amended Complaint [#25], and the instant cross-motions for summary judgment followed.

---

[4] In addition to the 2,000 square-foot provision, Plaintiffs' First Amended Complaint challenges TEX. OCC. CODE § 1601.353(1)(B), which imposes a 1,000 square-foot minimum on barber schools located in municipalities with populations of 50,000 or fewer. Plaintiffs represented at hearing, however, that the 2,000-square-foot provision, and not the 1,000-square-foot provision, is applicable to the Institute in its present location. Plaintiffs' challenge to TEX. OCC. CODE § 1601.353(1)(B) is therefore DISMISSED sua sponte as unripe.

## Analysis

### I.      Legal Standard

### A.      Summary Judgment

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id*. The party opposing summary judgment is required

to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

**B.     Section 1983 - Fourteenth Amendment Substantive Due Process**

Section 1983 provides a federal remedy for violations, under color of state law, of the rights secured by the Constitution, including the right to substantive due process guaranteed by the Fourteenth Amendment. *Energy Mgmt. Corp. v. City of Shreveport*, 467 F.3d 471, 481 (5th Cir. 2006). To prove a substantive due process claim, a plaintiff must show the challenged government action is arbitrary, unreasonable, or has no relationship to a legitimate government interest. *See Simi Inv. Co. v. Harris Cnty., Tex.*, 236 F.3d 240, 249 (5th Cir. 2000) (stating government action comports with substantive due process if "rationally related to a legitimate government interest" and impinges upon it if "arbitrary or capricious").

The liberty protected by substantive due process encompasses an individual's freedom to pursue his or her chosen profession. *See Martin v. Mem'l Hosp. at Gulfport*, 130 F.3d 1143, 1148 (5th Cir. 1997) (liberty interest includes "freedom to work and earn a living" (internal quotes

omitted)).  Denial of a license to practice one's profession can work a deprivation of that liberty interest, if the reasons for the denial offend due process.  *Id.* at 1149 (citing *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 238–39 (1957)).  Governments may, of course, require applicants for professional licensure to meet "high standards of qualification," but the qualifications required must have a rational connection with the fitness or capacity of the applicant to practice his or her profession.  *Schware*, 353 U.S. at 239.

## II.   Application

Plaintiffs claim the Minimums are irrational as applied to them and argue Defendants have articulated no rational basis for application of the Minimums Plaintiffs have not negated.  Defendants respond the Minimums have "multiple conceivable rational bases," Plaintiffs have failed to negate all such conceivable bases, and the Minimums are therefore valid.  At hearing, Defendants candidly admitted the provisions Plaintiffs challenge may not be sensible or particularly well-crafted, but nevertheless maintained their constitutionality, arguing the Texas legislature could have believed its decision to apply the Minimums to African hair braiding schools served the government's legitimate interests in protecting public health and safety and in establishing uniformity among barber schools.

In support of their position, Defendants cite the Supreme Court's decision in *Williamson v. Lee Optical, Inc.*, 348 U.S. 483 (1955), in which the Court considered a constitutional challenge to an Oklahoma law prohibiting opticians from fitting or duplicating corrective lenses without a prescription from an ophthalmologist or optometrist.  Reversing the lower court's finding the law violated the Due Process Clause, the Court explained:

> The Oklahoma law may exact a needless, wasteful requirement in many cases.  But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement. . . .  [T]he law need not be in every respect logically

> consistent with its aims to be constitutional. It is enough that there is an evil at hand
> for correction, and that it might be thought that the particular legislative measure was
> a rational way to correct it.

383 U.S. at 487–88. Thus, contend Defendants, as it might be thought the Minimums served a

legitimate government interest, under the rational basis test as articulated in *Lee Optical*, the

Minimums are constitutional. Much of Defendants' argument during hearing was devoted to the

familiar proposition that judicial deference to legislative decision making is at its apex during

rational basis review.

Plaintiffs strenuously refute Defendants' characterization of the test, noting that while

rational basis review does not serve as "a forum for mere disagreement with legislative choices," it

remains a meaningful standard of review, and merely describing the test "does not explain what

courts actually *do* when they conduct a rational-basis inquiry." Pls.' Opp. Def.'s Mot. Summ. J.

[#36] at 7–8 (emphasis in original). The linchpin of Plaintiffs' argument is *St. Joseph Abbey v.

Castille*, 712 F.3d 215 (5th Cir. 2013), in which the Fifth Circuit struck down a portion of a

Louisiana regulatory scheme governing casket sales as violative of the Abbey's due process rights.

The scheme at issue in *St. Joseph Abbey* permitted caskets to be sold only in a licensed

funeral home by a licensed funeral director. 712 F.3d at 217–18. In order to become a licensed

funeral home such that it could sell caskets to the public, the Abbey would have been required,

among other burdens, to build a layout parlor with room for thirty people, a display room for six

caskets, an arrangement room, and embalming facilities. *Id.* at 218. The Abbey sued the agency

charged with administering the scheme under § 1983, claiming the scheme was irrational and

violated due process. *Id.* at 220. The agency argued the scheme was owed deference under *Lee*

*Optical* and was rationally related to Louisiana's interests in regulating the funeral profession, consumer protection, public health, and public safety. *Id.* at 221.

In considering the agency's argument, the Fifth Circuit discussed *Lee Optical* at length, noting *Lee Optical* "is generally seen as a zenith of [] judicial deference to state economic regulation" and embodied a "willingness to accept post hoc hypotheses" to shield such regulation against constitutional challenge. *Id.* But, the Fifth Circuit explained, despite its healthy measure of deference to the legislature, *Lee Optical* "placed emphasis on the 'evil at hand for correction' to which the law was aimed" and "insist[ed] upon a rational basis, which it found." *Id.* at 221, 223. Thus, for the *St. Joseph Abbey* panel, "[t]he pivotal inquiry" remained whether a rational basis "that can now be articulated and is not plainly refuted by the Abbey" supported the Louisiana scheme. *Id.* at 223. The Fifth Circuit therefore evaluated the agency's proffered rational bases "informed by [the scheme's] setting and history," "[m]indful that a hypothetical rationale, even post hoc, cannot be fantasy," and urging the correct "analysis does not proceed with abstraction for hypothesized ends and means do not include post hoc hypothesized facts." *Id.*

The undersigned agrees with Plaintiffs that *St. Joseph Abbey*'s nuanced articulation and application of the rational basis test controls. *See also United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938) ("[T]he existence of facts supporting the legislative judgment is to be presumed . . . *unless in light of the facts made known or generally assumed* it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." (emphasis added)). Applying the principles set forth in *St. Joseph Abbey* to this case, the Court finds the Minimums are unconstitutional as applied to Plaintiffs, as Plaintiffs have

successfully refuted every purported rational basis for the Minimums articulated by Defendants, and the Court can discern no other rational bases for the Minimums in light of the facts at hand.

Defendants argue the 10-Chair Minimum has a rational basis because it "ensures that each student has an adequate space in which to work and maintain a clean environment," which the Court reads as an appeal to public health and safety. Def.'s Mot. Summ. J. [#33] at 16. While at first blush that justification seems reasonable, it is fatally undermined by another portion of the regulatory scheme. Barber schools "that offer[] only the hair braiding curriculum" are exempt from the requirement they have "one barber chair available for each student"; rather, such schools need provide only an "adequate number" of "chairs." *See* 16 TEX. ADMIN. CODE § 82.72(h) (exempting schools which teach only hair braiding from the requirements of 16 TEX. ADMIN. CODE § 82.72(c)). If braiding students actually needed barber chairs to have adequate workspace or to maintain a clean environment, it would make no sense to exempt braiding schools from the requirement that students have their own barber chairs. The Court agrees with Plaintiffs that requiring Brantley to install in the Institute ten barber chairs her students are statutorily exempt from actually using is not rationally related to any legitimate legislative purpose.

The 5-Sink Minimum is irrational as applied to Plaintiffs for similar reasons. Defendants' proffered justification for the 5-Sink Minimum is that it "relates to the health and safety purpose of the Barber Act by ensuring that every student will have ample access to a sink to practice the necessary disinfecting protocols mandated by the statu[t]es and rules—including those governing hair braiding instruction and practice." Def.'s Mot. Summ. J. [#33] at 17 (citing 16 TEX. ADMIN. CODE §§ 82.101, 82.110). Defendants' justification, however, does not make sense in light of the very statutorily mandated disinfecting rules which they cite. Braiders can satisfy Texas's sanitation

standards for their hands through use of liquid hand sanitizer alone. *See* 16 TEX. ADMIN. CODE § 82.110(a) ("[H]air braiders shall wash their hands with soap and water, *or use a liquid hand sanitizer*, prior to performing any services on a client." (emphasis added)).  Further, the statutory scheme does not "require" use of a sink, as Defendants erroneously argue, to clean and disinfect the tools braiders use when braiding clients' hair.  The scheme defines "[c]lean or cleansing" as "[w]ashing with liquid soap and water, detergent, antiseptics, or other adequate methods to remove all visible debris or residue" and "[d]isinfect or disinfection" as "[t]he use of chemicals to destroy pathogens . . . to render an item safe for handling, use, and disposal[.]" *See id.* §§ 82.100(2)–(3). Nowhere does the scheme mandate use of a sink to clean or disinfect.

The irrationality of the 5-Sink Minimum as applied to Plaintiffs becomes even more apparent in light of the fact the Institute, as a licensed braiding salon, is not required to provide sinks for its braiders to use while actually braiding clients' hair.[5]  *See id.* §§ 82.71(i), (r) (requiring "at least one sink, *wash basin, or hand sanitizer*" for every three workstations (emphasis added)).  The lack of a sink requirement for licensed braiding salons makes sense, as washing hair is not involved in the braiding process, and under the barbering statutes, may not legally be performed by a braider. *Compare* TEX. OCC. CODE § 1601.259(a) ("A person holding a hair braiding [license] may perform only barbering as defined by Section 1601.002(1)(K)"), *with id.* § 1601.002(1)(I) (defining barbering to include shampooing and conditioning hair).  The Court finds requiring Plaintiffs to install five sinks neither required to satisfy Texas's sanitation standards nor legally usable to wash clients' hair is not rationally related to a legitimate legislative purpose.

---

[5] Braiding salons are required to make "[h]and washing facilities, including hot and cold running water" available to their employees. 16 TEX. ADMIN. CODE § 82.102(k). There is no minimum associated with this requirement, and it is undisputed the Institute contains a bathroom with a sink and hot and cold running water.

Finally, Defendants argue the Square-Footage Minimum (and, to some extent, the 10-Chair Minimum) rationally relates to the government's interest in promoting "effective and efficient inspection of facilities" by ensuring the state will not be required to inspect many small barber schools for compliance with state law. Relatedly, Defendants contend uniform barber school size ensures "schools . . . may be able to offer a 'broader range of services that better serve consumer needs.'" Def.'s Reply [#39] at 5 (quoting *Greater Hous. Small Taxicab Owners Ass'n v. City of Hous.*, 660 F.3d 235, 240 (5th Cir. 2011)). Plaintiffs counter that what amounts to administrative convenience is not a valid rational basis for the Square-Footage (or 10-Chair) Minimum where its to African hair braiding schools will have the effect of forcing them completely out of the market for instruction in African hair braiding techniques.

Concerning Defendants' argument regarding inspection of facilities, the Court is not persuaded concern regarding inspections was an "'evil at hand for correction' to which the [Square-Footage (or 10-Chair) Minimum] was aimed." *See St. Joseph Abbey*, 712 F.3d at 221. Defendants point to a Texas House Research Organization bill analysis which, in 2005, concluded authority to administer the cosmetology and barbering regulations should be transferred to the TDLR from the Texas Cosmetology Commission (TCC) and the State Board of Barber Examiners (SBBE), the agencies then responsible for administering the scheme, because annual health and safety inspections were backlogged under the TCC and SBBE. *See* Def.'s Mot. Summ. J. [#33-2], Ex. 2 (Bill Analysis) at 6–7. But the backlog cited by the bill analysis had nothing to do with the number or size of barber schools that needed to be inspected. Rather, the bill analysis points to problems with TCC and SBBE management—"gross fiscal mismanagement" and "inadequate enforcement authority," among

others—as reasons the backlog developed, and concludes "a well managed agency such as TDLR . . . . would resolve th[ose] operational deficiencies[.]" *Id.*

Moreover, the current regulatory scheme as it relates to inspections casts serious doubt upon Defendants' hypothesized claim that were small braiding schools permitted to enter the market, an inspection backlog would result. Licensed barber schools are required to pay the fees associated with their own state inspections, 16 TEX. ADMIN. CODE § 82.80(h), and the TDLR sets fees "in amounts that will cover [TDLR's] costs and ensure [TDLR] has adequate resources to operate effectively and efficiently." 38 Tex. Reg. 9519 (Dec. 27, 2013). Further, TDLR is authorized to contract with outside inspectors to perform school inspections. TEX. OCC. CODE § 1603.1045. Consequently, as Plaintiffs point out, TDLR is permitted to require the schools being inspected to pay any costs associated with hiring sufficient personnel to conduct inspections.

Further, Defendants' argument larger schools may be able to offer a broader range of services to consumers is irrational in light of the facts before the Court for two reasons. First, at hearing, the Court asked Defendants whether they could provide a single example of a Texas barber school which, like the Institute, teaches solely African hair braiding, yet also complies with the Minimums. Defendants could not. The Court afforded Defendants ten days to come up with such an example. Still, Defendants could not. The absence of any such schools is troubling, as the Texas regulatory scheme explicitly contemplates the existence of barber schools which teach solely the thirty-five hour hair braiding curriculum. Given the logical disconnect inherent in a scheme which contemplates the existence of hair braiding schools but makes it prohibitively difficult for a hair braiding school to enter the market in hair braiding instruction, it appears to the Court that as applied to Plaintiffs, the Minimums, rather than logically connecting means and ends, shoehorn two unlike

-14-

professions "into a single, identical mold, by treating hair braiders—who perform a very distinct set of services—as if they were [barbers]." *See Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012) (citing *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1118 (S.D. Cal. 1999)) (distinguishing braiders from cosmetologists).

Second, Plaintiffs' exclusion from the market in braiding instruction plainly does not serve consumer needs. In her affidavit, Brantley testifies many of her students have attended a 35-hour braiding program at a barber school and thereafter enroll at the Institute to actually learn how to braid, "not having learned to braid hair properly at the barber school." Pls.'s Mot. Summ. J. [#34-1] (Brantley Aff.) ¶ 17. This is perhaps unsurprising, given that as of March 2014, Texas had issued zero individual hair braiding instructors' licenses, *see* Pls.'s Mot. Summ. J. [#34-2], Ex. 4 (Def. Kuntz's Answers to Pls.' First Interrogs.) at 8, and braiding is not part of the general barbering licensure curriculum, *see* 16 TEX. ADMIN. CODE § 81.120(d).

Attempting to demonstrate why closing the market in braiding instruction to Plaintiffs does not demonstrate irrationality, Defendants cite *Greater Houston Small Taxicab Company Owners Association v. City of Houston*, in which the Fifth Circuit found it rational for the city to give preferential treatment in awarding individual driver permits to large taxicab companies over small ones because large companies could better serve consumer needs, effectively preventing small companies from expanding. 660 F.3d at 240. But unlike in this case, the service offered by both companies in *City of Houston*—transportation by taxicab—was fundamentally identical. *Id.* Braiding and general barbering are not fundamentally identical services, as is illustrated by the exemption of schools offering only braiding instruction from a host of requirements generally applicable to barber schools. *See* 16 TEX. ADMIN. CODE § 82.72(h). *City of Houston* does not

-15-

support the proposition that it is rational to treat very different businesses as though they are the same. *See City of Houston*, 660 F.3d at 240 (distinguishing a case cited by the plaintiff because "[t]hat case involved a statute that treated very different businesses as though they were the same. We confront the inverse situation: an ordinance that treats similar businesses differently.").

Given all of the above, it is the opinion of the Court acceptance of the argument Defendants urge requires the type of analysis specifically rejected by *St. Joseph Abbey*: one which "proceed[s] with abstraction for hypothesized ends" and where an explanation of means "include[s] post hoc hypothesized facts." 712 F.3d at 221. As evidenced by the regulatory scheme governing hair braiding and the facts before the Court, the Minimums exclude Plaintiffs from the market absent "a rational connection with . . . fitness or capacity to engage in" hair braiding instruction, *Schware*, 353 U.S. at 239, and do not advance public health, public safety, or any other legitimate government interest in so doing. Consequently, as applied to Plaintiffs, the Minimums and their implementing regulations fail to pass constitutional muster.

## Conclusion

Accordingly,

IT IS ORDERED that Plaintiffs Isis Brantley and Isis Ornamentations and Natural Hair Care Consultant d/b/a The Institute of Ancestral Braiding's claim concerning the constitutionality of Texas Occupational Code § 1601.353(1)(B) is DISMISSED as unripe;

IT IS FURTHER ORDERED that Plaintiffs Isis Brantley and Isis Ornamentations and Natural Hair Care Consultant d/b/a The Institute of Ancestral Braiding's Motion for Summary Judgment [#34] is DENIED as to the claim dismissed above and GRANTED in all other respects; and

IT IS FINALLY ORDERED that Defendants William H. Kuntz, Jr., Mike Arismendez, LuAnn Roberts Morgan, Fred N. Moses, Catherine Rodewald, Deborah Yurco, Ravi Shah, and Thomas F. Butler's Motion for Summary Judgment [#33] is DENIED.

SIGNED this the __5th__ day of January 2015.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE